948 F.2d 98
 138 L.R.R.M. (BNA) 2944, 139 L.R.R.M. (BNA) 2613,
120 Lab.Cas. P 10,996, 123 Lab.Cas. P 10,337
 UNITED STATES of America, Plaintiff-Appellee,
v.
INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS,
WAREHOUSEMEN AND HELPERS OF AMERICA, AFL-CIO, the Commission
of La Cosa Nostra, Anthony Salerno, also known as Fat Tony,
Matthew Ianniello, also known as Matty the Horse, Nunzio
Provenzano, also known as Nunzi Pro, Anthony Corallo, also
known as Tony Ducks, Salvatore Santoro, also known as Tom
Mix, Christopher Furnari, Sr., also known as Christie Tick,
Frank Manzo, Carmine Persico, also known as Junior, also
known as The Snake, Gennaro Langella, also known as Gerry
Lang, Philip Rastelli, also known as Rusty, Nicholas
Marangello, also known as Nicky Glasses, Joseph Massino,
also known as Joey Messina, Anthony Ficarotta, also known as
Figgy, Eugene Boffa, Sr., Francis Sheeran, Milton Rockman,
also known as Maishe, John Tronolone, also known as Peanuts,
Joseph John Aiuppa, also known as Joey O'Brien, also known
as Joe Doves, also known as Joey Aiuppa, John Phillip
Cerone, also known as Jackie the Lackie, also known as
Jackie Cerone, Joseph Lombardo, also known as Joey the
Clown, Angelo LaPietra, also known as The Nutcracker, Frank
Balistrieri, also known as Mr. B, Carl Angelo DeLuna, also
known as Toughy, Carl Civella, also known as Corky, Anthony
Thomas Civella, also known as Tony Ripe, General Executive
Board, International Brotherhood of Teamsters, Chauffeurs,
Warehousemen and Helpers of America, Jackie Presser, General
President, Weldon Mathis, General Secretary-Treasurer,
Joseph Trerotola, also known as Joe T, First Vice President,
Robert Holmes, Sr., Second Vice President, William J.
McCarthy, Third Vice President, Joseph W. Morgan, Fourth
Vice President, Edward M. Lawson, Fifth Vice President,
Arnold Weinmeister, Sixth Vice President, John H. Cleveland,
Seventh Vice President, Maurice R. Schurr, Eighth Vice
President, Donald Peters, Ninth Vice President, Walter J.
Shea, Tenth Vice President, Harold Friedman, Eleventh Vice
President, Jack D. Cox, Twelfth Vice President, Don L. West,
Thirteenth Vice President, Michael J. Riley, Fourteenth Vice
President, Theodore Cozza, Fifteenth Vice President, Daniel
Ligurotis, Sixteenth Vice President, and Salvatore
Provenzano, also known as Sammy Pro, Former Vice President, Defendants,
Yellow Freight Systems, Inc., Appellant.
 No. 1839, Docket 91-6096.
 United States Court of Appeals,
Second Circuit.
 Argued July 22, 1991.
Decided Oct. 29, 1991.
As Amended Feb. 14, 1992.
 
 Jay G. Swardenski, Chicago, Ill. (Larry G. Hall, Kirk D. Messmer, Patrick W. Kocian, Matkov, Salzman, Madoff & Gunn, Chicago, Ill., of counsel), for appellant.
 James L. Cott, Asst. U.S. Atty., S.D.N.Y., New York City (Otto G. Obermaier, U.S. Atty., S.D.N.Y., Edward T. Ferguson, III, Asst. U.S. Atty., S.D.N.Y., New York City, of counsel), for plaintiff-appellee.
 Paul Alan Levy, Alan B. Morrison, Public Citizen Litigation Group, Washington, D.C., for protestors Patrick N. Clement and Robert McGinnis.
 Barbara J. Hillman, Gilbert A. Cornfield, Cornfield and Feldman, Chicago, Ill., for Election Officer Michael H. Holland.
 Before WINTER, ALTIMARI, and MAHONEY, Circuit Judges.
 MAHONEY, Circuit Judge:
 
 
 1
 Appellant Yellow Freight Systems, Inc. ("Yellow Freight") appeals from an order of the United States District Court for the Southern District of New York, David N. Edelstein, Judge, entered April 3, 1991. That order affirmed a determination of officers appointed pursuant to a certain consent decree (the "Consent Decree") relating to the affairs of defendant International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, AFL-CIO (the "IBT") that granted nonemployee members of the IBT access to premises of Yellow Freight to campaign for union office, and denied Yellow Freight's application for declaratory and injunctive relief from that determination. Yellow Freight seeks to enforce a "no solicitation" rule by barring nonemployee union members from campaigning for union office on its property. The district court upheld the appointed officers' determination denying effect to Yellow Freight's rule.
 
 
 2
 We conclude that the district court was entitled to exercise jurisdiction over Yellow Freight pursuant to the All Writs Act, 28 U.S.C. § 1651 (1988), and was not preempted from that jurisdiction by the authority of the National Labor Relations Board (the "NLRB") to determine issues concerning unfair labor practices under the National Labor Relations Act (the "NLRA"), 29 U.S.C. §§ 151-169 (1988). We also conclude, however, that the district court and its appointed officers did not adequately consider the availability of alternate means by which the barred IBT campaigners might communicate with employees of Yellow Freight who are members of the IBT.
 
 
 3
 We accordingly vacate and remand.
 
 Background
 
 4
 This appeal arises from an ongoing effort of the United States government to rid the IBT of organized crime influence. To that end, the United States commenced this litigation in the United States District Court for the Southern District of New York on June 28, 1988 pursuant to the Racketeer Influenced and Corrupt Organizations Act of 1970 ("RICO"), 18 U.S.C.A. §§ 1961-1968 (1984 & Supp.1991), and the Consent Decree was entered on March 14, 1989.
 
 
 5
 The Consent Decree has generated considerable litigation in the Southern District and in this court. As we summarized its provisions in one of those prior cases:
 
 
 6
 Under the Consent Decree, three court officers are appointed to oversee certain aspects of the affairs of the IBT: an Election Officer, an Investigations Officer and an [Independent] Administrator. The Election Officer is to supervise the 1991 election of IBT officers. The Investigations Officer is granted authority to investigate corruption and prosecute disciplinary charges against any officer, member or employee of the IBT or any of its affiliates. The [Independent] Administrator oversees the implementation of the remedial provisions of the Consent Decree. For example, the [Independent] Administrator sits as an impartial decisionmaker in disciplinary cases brought by the Investigations Officer, conducts the disciplinary hearings and decides them. The [Independent] Administrator may also apply to the district court to facilitate implementation of the Consent Decree, and the other parties to the Decree may make such applications as well. Furthermore, the district court is vested with "exclusive jurisdiction" to decide any issues relating to the actions or authority of the [Independent] Administrator. And the IBT Constitution is amended to incorporate and conform with all of the terms of the Consent Decree.
 
 
 7
 United States v. IBT, 905 F.2d 610, 613 (2d Cir.1990).
 
 
 8
 The fair and open conduct of the 1991 IBT election is a central purpose of the Consent Decree. The election encompasses three phases: (1) the rank-and-file secret ballot election of delegates to the 1991 IBT convention; (2) the election of trustees and nomination of national and regional officers at that convention; and (3) the subsequent rank-and-file secret ballot election of national and regional officers. The dispute at issue in this case arises from campaign activities occurring in the initial (delegate selection) phase of the 1991 election, but has significant implications for the third (election of national and regional officers) phase which is now in process.
 
 
 9
 Yellow Freight, many of whose employees are IBT members, has the following company policy:
 
 
 10
 There shall be no distribution of literature or solicitation by non-employees in working or non-working areas during working or non-working times. In other words, non-employees are not allowed on company property for the purpose of distributing literature or soliciting.
 
 
 11
 This appeal involves two incidents at Yellow Freight facilities challenging that policy. The first occurred in Chicago Ridge, Illinois. The second occurred in Detroit, Michigan. In October 1990, two IBT members who are not Yellow Freight employees, Patrick N. Clement and Robert McGinnis, entered an unfenced parking lot at the Chicago Ridge facility. They were candidates for delegate from IBT Local 710 to the 1991 IBT convention. Yellow Freight officials asked them to leave and summoned the police, who also asked the men to leave, which they eventually did. They moved to a public sidewalk nearby and continued campaigning. In December 1990, two IBT members who also are not Yellow Freight employees, Michael Hewer and James McTaggart, campaigned for union office at the employee walk-through gate at the Detroit facility. They were required to leave Yellow Freight's premises by Yellow Freight security personnel.
 
 
 12
 McGinnis, Clement, and Hewer filed protests with the Election Officer, alleging that their exclusion by Yellow Freight violated IBT election rules promulgated pursuant to the Consent Decree (the "Election Rules"). See United States v. IBT, 931 F.2d 177, 184-90 (2d Cir.1991) (approving Election Rules with modification). Following separate investigations in Chicago Ridge and Detroit, the Election Officer issued two opinions. The first, dealing with the Clement/McGinnis protest, determined that Yellow Freight's policy violated the Election Rules by completely barring Clement and McGinnis from the Chicago Ridge facility, because campaigning on the nearest public sidewalk would provide no meaningful access to the IBT drivers employed by Yellow Freight. The Election Officer therefore required limited access for Clement and McGinnis to Yellow Freight's property either at a parking lot across the street from Yellow Freight's terminal facilities or at an open area outside the terminal building, at Yellow Freight's option. The Election Officer upheld Yellow Freight's exclusion of Hewer from the Detroit facility, however, finding that Hewer could campaign effectively from a public sidewalk and grassy area adjacent to that facility. In making both determinations, the Election Officer restricted his consideration of the availability of alternative means of communication with employees of Yellow Freight to those available at the Chicago Ridge and Detroit terminals.
 
 
 13
 Yellow Freight appealed the determination regarding Clement and McGinnis to the Independent Administrator, and Hewer appealed the determination adverse to him. The Administrator affirmed both rulings.[1] In doing so, he invoked Article VIII, section 10(d) of the Election Rules, which provides that "no restrictions shall be placed upon candidates' or members' pre-existing rights to solicit support, distribute leaflets or literature, ... or engage in similar activities on employer or Union premises," as well as Article XI, section 2, which includes among the remedies available to the Election Officer in resolving a protest: "requiring or limiting access." The Administrator reasoned: "In general, the 'pre-existing rights' to engage in campaign activity include any past practice or agreement among employers and the IBT, or its members, which allows for such campaign activity, and any substantive rights of union members to engage in such conduct as established by applicable law."
 
 
 14
 The Administrator found such a right of access for union campaign activity under applicable federal labor law. He further affirmed the rulings of the Election Officer that adequate alternative means of communication were available to Hewer at the Detroit facility, but not to Clement and McGinnis at the Chicago terminal. In affirming the latter ruling, the Administrator considered almost exclusively alternative campaigning feasibilities at the Chicago Ridge terminal, except for the following conclusory statement: "the complainants did not have a reasonable alternative means of communication off company property with IBT members at this facility."
 
 
 15
 Yellow Freight made additional arguments to the Independent Administrator, and in a subsequent appeal to the district court, which parallel those pressed on this appeal. The district court affirmed the determination of the Administrator, and accordingly denied Yellow Freight's application for declaratory and injunctive relief directed against that determination.
 
 
 16
 This appeal followed.
 
 Discussion
 
 17
 Yellow Freight tenders four arguments on appeal:
 
 
 18
 (1) the Consent Decree cannot validly be applied or enforced against Yellow Freight pursuant to either the All Writs Act or any other asserted authority, because Yellow Freight is not a party to the Consent Decree;
 
 
 19
 (2) the Independent Administrator, the Election Officer, and the district court are denied jurisdiction over Yellow Freight by the NLRA, which vests exclusive jurisdiction over the conduct at issue in the NLRB;
 
 
 20
 (3) even assuming jurisdiction, the determination herein is not in accordance with law; and
 
 
 21
 (4) Yellow Freight should be awarded injunctive relief against any further exercise of authority over it by the Independent Administrator or Election Officer.
 
 
 22
 We address each in turn.
 
 
 23
 A. The Enforcement of the Consent Decree against Yellow Freight.
 
 
 24
 The district court premised its assertion of authority over Yellow Freight upon the All Writs Act, which provides in pertinent part:
 
 
 25
 The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law.
 
 
 26
 28 U.S.C. § 1651(a) (1988).
 
 As the Supreme Court has stated:
 
 27
 The power conferred by the Act extends, under appropriate circumstances, to persons who, though not parties to the original action or engaged in wrongdoing, are in a position to frustrate the implementation of a court order or the proper administration of justice, and encompasses even those who have not taken any affirmative action to hinder justice.
 
 
 28
 United States v. New York Tel. Co., 434 U.S. 159, 174, 98 S.Ct. 364, 373, 54 L.Ed.2d 376 (1977) (citations omitted); see also Yonkers Racing Corp. v. City of Yonkers, 858 F.2d 855, 863 (2d Cir.1988), cert. denied, 489 U.S. 1077, 109 S.Ct. 1527, 103 L.Ed.2d 833 (1989); Benjamin v. Malcolm, 803 F.2d 46, 53 (2d Cir.1986), cert. denied, 480 U.S. 910, 107 S.Ct. 1358, 94 L.Ed.2d 528 (1987); In re Baldwin-United Corp., 770 F.2d 328, 338 (2d Cir.1985).
 
 
 29
 Despite this authority, Yellow Freight contends that the Consent Decree cannot be enforced against it because Yellow Freight is not a party to the Consent Decree. Yellow Freight cites, in support of this view, our recent statement that:
 
 
 30
 It is true that, for purposes of interpretation, a consent decree is treated as a contract among the settling parties, Firefighters v. City of Cleveland, 478 U.S. 501, 106 S.Ct. 3063, 92 L.Ed.2d 405 (1986), and that the terms of a consent decree cannot be enforced against those who are not parties to the settlement. Martin v. Wilks, 490 U.S. 755, 109 S.Ct. 2180, 104 L.Ed.2d 835 (1989).
 
 
 31
 IBT, 931 F.2d at 185.
 
 
 32
 We proceeded immediately to acknowledge, however, that "there are several exceptions to this general rule," id., and invoked one of those exceptions to impose upon IBT affiliates, not parties to the Consent Decree, the election rules promulgated pursuant to the Consent Decree. See id. at 187. We have previously subjected other nonparties to the Consent Decree, see United States v. IBT, 907 F.2d 277, 279-80 (2d Cir.1990); IBT, 905 F.2d at 613 (2d Cir.1990), in the former case invoking the All Writs Act to affirm an order restraining all members and affiliates of the IBT from "filing or taking any legal action that challenges, impedes, seeks review of or relief from, or seeks to prevent or delay any act of [the court-appointed officers] in any court or forum in any jurisdiction except [the Southern District of New York]." 907 F.2d at 279. This case, in any event, does not require us to determine whether the Consent Decree, of its own force, applies to Yellow Freight. Rather, the issue here is whether the All Writs Act authorized the district court and the officials acting pursuant to its authority to issue the order requiring Yellow Freight to permit campaigning on its property.
 
 
 33
 Nor is it the case that Martin v. Wilks, 490 U.S. 755, 109 S.Ct. 2180, 104 L.Ed.2d 835 (1989), upon which Yellow Freight heavily relies, precludes the use of All Writs Act against Yellow Freight. In Martin, white firemen sued the City of Birmingham, Alabama, alleging that they were being denied promotions in favor of less qualified black firemen in violation of applicable federal law. 490 U.S. at 758, 109 S.Ct. at 2183. The promotions of the black firemen occurred in implementation of two previously entered consent decrees. Id. at 758-60, 109 S.Ct. at 2182-83. The Supreme Court ruled that, although the white firemen had not attempted to intervene in the litigation that led to the consent decrees, they were entitled to pursue their claims in the subsequent litigation. Id. at 761, 109 S.Ct. at 2184.
 
 
 34
 In other words, as we have stated, Martin "held that a failure to intervene does not bar a subsequent attempt to challenge actions taken pursuant to a consent decree." IBT, 931 F.2d at 184 n. 2; see also Independent Fed'n of Flight Attendants v. Zipes, 491 U.S. 754, 109 S.Ct. 2732, 2736-37, 105 L.Ed.2d 639 (1989) (similarly construing Martin ). Accordingly, Martin does not purport to bar any impact of a consent decree upon a nonparty to the decree. Rather, it is addressed to the issue whether such a nonparty is entitled to its own "day in court" to challenge any such impact. See Martin, 490 U.S. at 762, 109 S.Ct. at 761-62.
 
 
 35
 Yellow Freight also argues that a consent decree, as distinguished from a judgment resulting from litigation pursued to completion, cannot be enforced against a nonparty. Whatever the force of this argument, it is unavailing in this case because the district court has not purported to deem Yellow Freight bound by the Consent Decree. Instead, it has ruled that an order may issue under the All Writs Act to effectuate the Decree.
 
 
 36
 Yellow Freight further contends that the All Writs Act may be invoked only in certain categories of cases, and that this litigation fits none of those categories. We do not agree with Yellow Freight's characterization of this body of law. In any event, Yellow Freight concedes that "the All Writs Act allows substantive injunctions against technical non-parties ... [in at least some cases] to enforce a decree which adjudicates public rights." We believe that there is a strong public interest in the ongoing effort in this litigation to open the IBT to democratic processes and purge the union of organized crime influence.
 
 Further, as a general rule:
 
 37
 [I]f jurisdiction over the subject matter of and the parties to litigation is properly acquired, the All Writs Act authorizes a federal court to protect that jurisdiction even though nonparties may be subject to the terms of the injunction.
 
 
 38
 IBT, 907 F.2d at 281.
 
 
 39
 The district court has subject matter jurisdiction of the underlying controversy pursuant to RICO. Yellow Freight does not contest personal jurisdiction, and in any event, "the All Writs Act requires no more than that the persons enjoined have the 'minimum contacts' that are constitutionally required under due process." IBT, 907 F.2d at 281 (quoting International Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945)).
 
 
 40
 Since the jurisdictional requirements are satisfied, the remaining issues, in the language of the All Writs Act, are whether the district court's order was "necessary or appropriate" to the implementation of the Consent Decree, and whether it was imposed agreeably "to the usages and principles of law." 28 U.S.C. § 1651 (1988).
 
 
 41
 The district court articulated the need to provide access to Yellow Freight's Chicago Ridge terminal in the following terms:
 
 
 42
 [T]he crux of this Consent Decree is ... free, open and fair secret ballot elections. In order for those elections to be meaningful, the IBT rank and file must be given a fair choice of candidates. But the reality of such an election is that incumbents may often hold distinct advantages in name recognition, and access to members of a local. Employers may have developed comfortable relationships with incumbent IBT officers, and may not be anxious for new, and perhaps more assertive union representatives. As a result, jurisdiction over employers such as Yellow Freight may be necessary "in aid of this Court's jurisdiction."
 
 
 43
 As an additional matter, ... the Independent Administrator reasoned that employers such as Yellow Freight "have the power, if not restrained, to subvert the electoral process ..." were they to bar IBT members from exercising their right to campaign on employers' premises.... Second, the Independent Administrator found that non-employee IBT members have a limited "pre-existing right" of access to non-employer premises as guaranteed by the National Labor Relations Act, ("NLRA") 29 U.S.C. § 158(a)(1), and its subsequent interpretations.
 
 
 44
 United States v. IBT, No. 88 Civ. 4486 (DNE), slip op. at 6-7, 1991 WL 51065 (S.D.N.Y. Apr. 3, 1991).
 
 
 45
 We agree with this assessment of the need for limited access to employer premises where no feasible alternative for campaigning by candidates for union office is available. We therefore conclude that the order on appeal was "necessary or appropriate in aid of" the district court's jurisdiction over the underlying litigation in which the Consent Decree was entered, and turn to the issue whether it was "agreeable to the usages and principles of law."
 
 
 46
 We first consider whether the procedure made available to Yellow Freight to contest the asserted access was "agreeable to the usages and principles of law," bearing in mind the mandate of Martin v. Wilks that Yellow Freight have its "day in court" on the issue. See 490 U.S. at 762, 109 S.Ct. at 2184. Yellow Freight contends that it was denied "due process," and thereby (a fortiori ) traditional legal protections, because it was subjected to a consent decree to which it was not a party. But, as we have pointed out, the district court did not rule that the Consent Decree, of its own force, bound Yellow Freight. It acted pursuant to the All Writs Act, and we therefore turn our attention to the particular procedures that have been applied herein in adjudicating Yellow Freight's claimed entitlement to bar Clement and McGinnis from the Chicago Ridge terminal.
 
 
 47
 Yellow Freight's position has been considered by both the Election Officer and the Independent Administrator, and reviewed, now, by two federal courts. The Election Officer, a former general counsel of the United Mine Workers, inspected both sites at issue, accepted submissions from the parties, wrote letter opinions that addressed the factual and legal contentions of the parties, and decided the controversy regarding the Detroit terminal in favor of Yellow Freight, although ruling against Yellow Freight regarding the Chicago Ridge terminal. The Independent Administrator, a former federal district judge, held a hearing at which testimony was presented, received prehearing legal submissions from the parties, and solicited posthearing submissions. He issued a detailed decision that carefully addressed the legal contentions of the parties, and made de novo findings of fact and conclusions of law.
 
 
 48
 Yellow Freight then availed itself of its right to appeal to the district court.[2] The district court held a hearing, incorporated the record developed by the IBT trustees at Yellow Freight's request, and issued a memorandum and order that again addressed the issues tendered by the parties. Now, of course, Yellow Freight has taken this appeal, in which the customary appellate procedures of federal circuit courts have been applied. Application may be made, by certiorari, for further review by the Supreme Court.
 
 
 49
 It is difficult to imagine additional or different procedures that would accord Yellow Freight a significantly enhanced opportunity to present its position concerning this controversy. Certainly, furthermore, these procedures are at least generally comparable to those provided by the NLRA for resolution by the NLRB and federal courts of unfair labor practice claims. See generally 29 U.S.C. § 160 (1988). We accordingly conclude that Yellow Freight has been accorded adequate procedural protections to satisfy the All Writs Act. Cf. United States v. IBT, 941 F.2d 1292, 1297-98 (2d Cir.1991) (procedures utilized in disciplinary actions pursuant to Consent Decree satisfy due process).
 
 
 50
 Further, the provision of access to the Chicago Ridge terminal is certainly, as a substantive matter, "agreeable to the usages and principles of law" within the meaning of the All Writs Act. There is a thoroughly developed body of federal labor law regarding this issue. Indeed, Yellow Freight contends that the merits of the issue are definitively addressed by the NLRA and consigned thereby to the exclusive jurisdiction of the NLRB. We turn to that contention.
 
 
 51
 B. NLRB Preemption.
 
 
 52
 Yellow Freight contends that the conduct at issue in this case is directly regulated by sections 7 and 8(a)(1) of the NLRA, 29 U.S.C. §§ 157 and 158(a)(1) (1988), and accordingly that the NLRB has exclusive jurisdiction with respect to it. In this connection, San Diego Building Trades Council v. Garmon, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959), a case involving attempted state regulation of conduct constituting an NLRA unfair labor practice, stated that "[w]hen an activity is arguably subject to § 7 or § 8 of the [NLRA], the States as well as the federal courts must defer to the exclusive competence of the [NLRB] if the danger of state interference with national policy is to be averted." Id. at 245, 79 S.Ct. at 780.
 
 
 53
 This rule, however, is not uniformly applied even as to state regulation. See, e.g., Sears Roebuck & Co. v. San Diego County Council of Carpenters, 436 U.S. 180, 182 & 207-08, 98 S.Ct. 1745, 1749, 1762-63, 56 L.Ed.2d 209 (1978) (enforcement of state trespass laws by state court allowed as to "picketing which is arguably--but not definitely--prohibited or protected by federal law"). Furthermore, where federal laws and policies other than the NLRA are implicated, the Garmon rule is frequently considered inapplicable. See, e.g., Breininger v. Sheet Metal Workers Int'l Ass'n Local Union No. 6, 493 U.S. 67, 110 S.Ct. 424, 429-35, 107 L.Ed.2d 388 (1989) (district court had jurisdiction to hear fair representation claim although union's breach of duty of fair representation might violate § 8(b) of the NLRA); International Bhd. of Boilermakers v. Hardeman, 401 U.S. 233, 237-39, 91 S.Ct. 609, 612-14, 28 L.Ed.2d 10 (1971) (district court had jurisdiction to hear claim that unlawful expulsion from union violated § 101(a)(5) of Labor-Management Reporting and Disclosure Act, 29 U.S.C. § 411(a)(5) (1988), although expulsion was arguably an unfair labor practice violative of §§ 8(b)(1)(A) and 8(b)(2) of NLRA); American Postal Workers Union v. United States Postal Service, 766 F.2d 715, 720 (2d Cir.1985) (district court and NLRB have concurrent jurisdiction over suits to enforce labor contracts, "even if the conduct involved might entail an unfair labor practice"), cert. denied, 475 U.S. 1046, 106 S.Ct. 1262, 89 L.Ed.2d 572 (1986); United States v. Boffa, 688 F.2d 919, 931 (3d Cir.1982) (in RICO prosecution alleging mail fraud predicates and substantive mail fraud violations, prohibition of defendants' conduct by § 8 of NLRA would not preclude "enforcement of a federal statute that independently proscribes that conduct"), cert. denied, 460 U.S. 1022, 103 S.Ct. 1272, 75 L.Ed.2d 494 (1983). Here, although the appointed officials are directly applying the NLRA rather than some separate body of law, considerations that we have previously recognized with respect to the Consent Decree argue compellingly for a ruling against exclusive NLRB jurisdiction.
 
 
 54
 We have affirmed an injunction prohibiting all members and affiliates of the IBT from initiating any legal proceeding relating to the Consent Decree "in any court or forum in any jurisdiction" (emphasis added) other than the district court from which this appeal was taken, IBT, 907 F.2d at 279, "as a necessary means of protecting the district court's jurisdiction over implementation of the Consent Decree." Id. at 280. We did so to avoid inconsistent interpretations of, and judgments regarding, the Consent Decree, and also to avoid repetitive litigation that would distract the government and the court-appointed officers from implementation of the Consent Decree. Id. It would be completely disruptive to rule that despite this arrangement, the district court has no authority to address any matter arising under the Consent Decree that might arguably be deemed an unfair labor practice under the NLRA.[3]
 
 
 55
 As we have stated, "a district judge can legitimately assert comprehensive control over complex litigation," IBT, 907 F.2d at 281, and this rule is properly invoked in this case. See id.; cf. Berger v. Heckler, 771 F.2d 1556, 1576 n. 32 (2d Cir.1985) (" '[f]ew persons are in a better position to understand the meaning of a consent decree than the district judge who oversaw and approved it' ") (quoting Brown v. Neeb, 644 F.2d 551, 558 n. 12 (6th Cir.1981)). We conclude that the NLRB does not have exclusive jurisdiction over the conduct at issue on this appeal, and that the district court and its appointed officers accordingly did not err in addressing it. Finally, by requiring strict adherence to the requirements of federal labor law in the enforcement of the Consent Decree, see infra, we preclude that "interference with national policy" that was the focal concern in Garmon. See 359 U.S. at 245, 79 S.Ct. at 779.
 
 C. The Merits.[4]
 
 56
 Finally, Yellow Freight contends that the substantive determination made by the Election Officer as to the Chicago Ridge terminal, and affirmed by the Independent Administrator and the district court, is incorrect as a matter of law.[5] As indicated supra, the claims of Clement and McGinnis for access to Yellow Freight's property are premised upon the provision in Article VIII, section 10(d) of the Election Rules that safeguards "candidates' or members' pre-existing rights to ... [campaign] ... on employer or Union premises." The Independent Administrator properly construed this provision to invoke both "past practice or agreement among employers and the IBT, ... and any substantive rights of union members to engage in such conduct as established by applicable law." The pertinent issue on this appeal is the content of the "applicable law," since no preexisting practice or agreement has been asserted to be pertinent to this controversy. For the reasons that follow, we conclude that the determination on appeal did not adequately consider the availability of alternate means of communicating with Yellow Freight's Chicago Ridge employees at locations other than the worksite, and that the case must accordingly be remanded for reconsideration by the district court and the court-appointed officers.
 
 
 57
 The landmark case in this area is NLRB v. Babcock & Wilcox Co., 351 U.S. 105, 76 S.Ct. 679, 100 L.Ed. 975 (1956), which ruled that:
 
 
 58
 [A]n employer may validly post his property against nonemployee distribution of union literature if reasonable efforts by the union through other available channels of communication will enable it to reach the employee with its message and if the employer's notice or order does not discriminate against the union by allowing other distribution.
 
 
 59
 Id. at 112, 76 S.Ct. at 684.
 
 
 60
 Explaining the balance to be struck, the Court went on to say:This is not a problem of always open or always closed doors for union organization on company property. Organization rights are granted to workers by the same authority, the National Government, that preserves property rights. Accommodation between the two must be obtained with as little destruction of one as is consistent with the maintenance of the other. The employer may not affirmatively interfere with organization; the union may not always insist that the employer aid organization. But when the inaccessibility of employees makes ineffective the reasonable attempts by nonemployees to communicate with them through the usual channels, the right to exclude from property has been required to yield to the extent needed to permit communication of information on the right to organize.
 
 
 61
 Id. (emphasis added).
 
 
 62
 Babcock and Wilcox involved efforts by unions to organize the pertinent employees, rather than intraunion elections. See id. at 106, 76 S.Ct. at 679. The issue, however, was whether the employers had violated section 8(a)(1) of the NLRA, 29 U.S.C. § 158(a)(1) (1988), by impeding their employees' section 7 "right to self-organization." 29 U.S.C. § 157 (1988). It has since been made clear that intraunion campaigning activities implicate employees' section 7 right "to form, join, or assist labor organizations," or to "refrain" therefrom, id., and that unlawful interference with that right is also a section 8(a)(1) unfair labor practice. See NLRB v. Magnavox Co., 415 U.S. 322, 324, 94 S.Ct. 1099, 1101, 39 L.Ed.2d 358 (1974); District Lodge 91, Int'l Ass'n of Machinists v. NLRB, 814 F.2d 876, 879 (2d Cir.1987).
 
 
 63
 Babcock and Wilcox ruled that "if the location of a plant and the living quarters of the employees place the employees beyond the reach of reasonable union efforts to communicate with them, the employer must allow the union to approach his employees on his property." 351 U.S. at 113, 76 S.Ct. at 685. On the other hand, the NLRA "does not require that the employer permit the use of its facilities for organization when other means are readily available." Id. at 114, 76 S.Ct. at 685. As the NLRB has summarized:
 
 
 64
 Babcock thus holds that where persons other than employees of an employer that owns or controls the property in question are concerned, "alternative means" must always be considered: a property owner who has closed his property to nonemployee communications, on a nondiscriminatory basis,[6] cannot be required to grant access where reasonable alternative means exist, but in the absence of such means the property right must yield to the extent necessary to permit the organizers to communicate with the employees.
 
 
 65
 Jean Country, 291 N.L.R.B. 11, 12 (1988) (emphasis partially added).
 
 
 66
 We have most recently considered this issue in National Maritime Union v. NLRB, 867 F.2d 767 (2d Cir.1989), where we affirmed an NLRB determination that an employer had not committed an unfair labor practice by barring union organizers from its boats because "the record [was] inadequate to establish that home visits were unreasonable," and the union "had the burden of proving that alternative means of communication were unreasonable." 867 F.2d at 775.
 
 
 67
 The problem with the determination on appeal here is that virtually no consideration was given to alternative ways of communicating with the Chicago Ridge employees of Yellow Freight away from the jobsite. Both the Election Officer and the Independent Administrator recognized in general terms the need to consider alternative means of communication, but specific attention was accorded only to alternatives immediately adjacent to the Chicago Ridge jobsite. The district court affirmed on the basis of the determination by the Independent Administrator. In view of the applicable law, this is clearly inadequate, and we must therefore vacate and remand.
 
 
 68
 In doing so, we note that the consideration of this issue on remand may take into account all pertinent matters, including time constraints imposed by the impending election schedule and cost factors. See National Maritime Union, 867 F.2d at 774. We note also that home visits were considered a plausible alternative in National Maritime Union because the union organizers were provided by the employer with the names and addresses of the employees whom the organizers sought to approach. See id. at 769. In sum, we do not seek to pose undue difficulties for the district court and the court-appointed officers in dealing practically and flexibly with the significant burden of overseeing the ongoing IBT election, but we cannot ratify decisions made in that effort which do not comport with the requirements of applicable law.
 
 
 69
 We note, finally, that if Yellow Freight should on remand be validly compelled to provide access to its Chicago Ridge property in connection with the 1991 IBT election, such compelled access would not inhibit Yellow Freight's continued entitlement to enforce its "no solicitation" policy in the future, in the absence of judicial direction to the contrary. Yellow Freight would not in such circumstances have voluntarily abandoned its policy or willingly established any exception to it. Cf. NLRB v. Southern Md. Hosp. Ctr., 916 F.2d 932, 937 (4th Cir.1990) ("[c]laims of disparate enforcement inherently require a finding that the employer treated similar conduct differently") (emphasis added); Restaurant Corp. of Am. v. NLRB, 827 F.2d 799, 807 (D.C.Cir.1987) (same); id. at 812 n. 3 (Bork, J., dissenting in part and concurring in part) (same). Accordingly, such a ruling would establish only that Yellow Freight may on occasion be required to provide access to its property in furtherance of the Consent Decree, despite its "no solicitation" policy. Yellow Freight would continue to be entitled to limit access to its property pursuant to the "no solicitation" policy, subject only to the general limits of federal labor law. See Babcock & Wilcox, 351 U.S. at 112, 76 S.Ct. at 684.
 
 
 70
 D. Injunctive Relief.
 
 
 71
 Yellow Freight asks that we direct the district court to permanently enjoin the Election Officer and Administrator "not to assert authority or jurisdiction over Yellow Freight under color of the [Consent Decree] or Election Rules, not to process any protest or grievance against any act by Yellow Freight, and not to seek to require Yellow Freight to respond ... to ... any protest or grievance arising [thereunder]." As is obvious from the foregoing, we will not provide such relief, since we deem Yellow Freight amenable to the authority of the district court and the court-appointed officers as to the dispute on appeal, pursuant to the All Writs Act, and do not consider the authority of the district court and its officers to deal with that dispute to be preempted by the NLRB. Our ruling is limited to assuring that the correct legal standards are applied in the resolution of this controversy.
 
 Conclusion
 
 72
 The order of the district court is vacated, and the case is remanded for further proceedings not inconsistent with this opinion. Yellow Freight's application for injunctive relief is denied. The parties shall bear their own costs.
 
 WINTER, Circuit Judge, dissenting:
 
 73
 I respectfully dissent.
 
 
 74
 I do not agree: (i) that the Consent Decree between the IBT and the government purports to vest jurisdiction in the court-appointed Administrator and reviewing federal courts to adjudicate unfair labor practice charges brought by two IBT members against an employer under the National Labor Relations Act ("NLRA");[1] (ii) that, if the Decree so empowers the Administrator, it is valid; or (iii) that the adjudication in question is authorized by the All Writs Act.I
 
 
 75
 With regard to (i), the meaning of the Consent Decree, Article VIII, Section 10(d), provides that "No restrictions be placed upon candidates' or members' pre-existing rights to solicit, support, distribute leaflets or literature ... or engage in general activities on employer or union premises." Giving this language its ordinary meaning in the present context, there is no basis for finding that Yellow Freight violated its terms. The words "pre-existing rights" seem no more than a reference to rights of access previously recognized by employers through contract or past practice or decreed by enforcement orders of the National Labor Relations Board ("NLRB"). This reading accords with the language used in the Consent Decree and limits the rights of access conferred by the Decree to rights enjoyed by the IBT that the IBT may lawfully confer upon IBT members.[2] However, under that reading, Yellow Freight did not violate the Consent Decree. Yellow Freight's no-solicitation rule was in effect when the Consent Decree was signed. Clement and McGinnis thus had no pre-existing right of access to Yellow Freight's premises.
 
 II
 
 76
 However, with regard to (ii), my colleagues read the language differently, based upon the Administrator's interpretation of the words "pre-existing rights" as including "all substantive rights of union members ... under established law." Under this reading, the Decree purports to vest jurisdiction in the Administrator to adjudicate nonemployees' claims of access to Yellow Freight's premises under the NLRA.
 
 
 77
 Putting aside the All Writs Act for the moment, it is a mystery to me where IBT and the government found the authority to empower the Administrator to adjudicate unfair labor practice charges involving non-parties to the Decree. This issue is not directly addressed in my colleagues' opinion. In fact, Congress has designated exclusive procedures for the adjudication of unfair labor practice claims. I know of no theory under which the IBT and the government had the power, essentially legislative in nature, to override Congress's explicit direction that Clement and McGinnis file their unfair labor practice charges with the NLRB.
 
 
 78
 Not surprisingly, I also do not agree that the IBT and the government had the power to erase Yellow Freight's right to litigate the unfair labor practice charges before the NLRB. Nor do I agree that allowing the IBT and the government to accomplish this legislative act was not a denial of due process to Yellow Freight. Yellow Freight did have hearings on the unfair labor practice charges before the Administrator and the district court. However, Yellow Freight was not accorded due process when the Consent Decree deprived it of the right to litigate unfair labor practice charges before the NLRB rather than before the Administrator. Yellow Freight had neither notice nor a hearing in the RICO proceeding as to the potential loss of its rights under federal law. If the IBT and the government had the power to erase Yellow Freight's rights, then Yellow Freight should have been made a party defendant in the RICO action and allowed to litigate to final judgment the issue of whether the loss of such rights could be granted as relief.
 
 III
 
 79
 This brings me to (iii), namely, the All Writs Act issue. I agree with my colleagues that, in contrast to the Consent Decree, the All Writs Act may confer jurisdiction over third parties where necessary to implement otherwise valid provisions of the Decree. My colleagues reason that the proceedings against Yellow Freight are necessary to avoid inconsistent interpretations of that Decree. If the Consent Decree merely incorporates pertinent provisions of the NLRA, however, then the only inconsistencies that might arise would be between the Administrator's interpretations of the NLRA and the NLRB's interpretations of the same statute. The apprehension that the Administrator may disagree with the NLRB as to the meaning of the NLRA, and the tacit but yet inexorable assumption that the Administrator's view should prevail, merely highlight the illegitimacy of viewing the Consent Decree as vesting the Administrator with jurisdiction over unfair labor practices. It goes without saying that the All Writs Act does not authorize the displacement of Congress's legislative scheme for the adjudication of unfair labor practices.
 
 
 80
 However, my colleagues' discussion of the preemption issue implies that the Consent Decree created independent rights of access, i.e., not based on the NLRA, by IBT candidates to employers' property. Their discussion of the preemption issue relies exclusively on cases in which claims based on other bodies of law, e.g., common law trespass claims or "where federal laws and policies other than the NLRA are implicated," overlap unfair labor practice claims and are validly adjudicated by tribunals other than the NLRB. Those cases are neither analogous nor relevant to the instant matter unless the Consent Decree is viewed as creating a new body of law to be enforced by third parties against other third parties for purposes of the IBT election, another legislative act the IBT and the government had no power to accomplish. Moreover, in their discussion of the All Writs Act, they emphasize the "public interest" in democratizing the IBT and purging it of organized crime influence. Again, this implies that the Decree embodies legal commands beyond those found in present labor law. Whatever the implications of the opinion, however, the content of these new legal commands is not spelled out. Indeed, the Administrator's view of his powers was limited to enforcing "substantive rights ... under established law," (emphasis added), and my colleagues purport to apply only standards derived from the NLRA.
 
 
 81
 I know of no precedent for this expansive use of the All Writs Act. United States v. IBT, 907 F.2d 277 (2d Cir.1990), held that local unions, who were not parties to the Consent Decree but are constituent bodies of the IBT, had to litigate issues concerning the meaning of that Consent Decree in the Southern District of New York. This essentially housekeeping decision dealt solely with inconsistencies concerning the meaning of the Consent Decree, not disagreements over the meaning of a federal statute, such as the NLRA. In Yonkers Racing Corp. v. City of Yonkers, 858 F.2d 855 (2d Cir.1988), cert. denied, 489 U.S. 1077, 109 S.Ct. 1527, 103 L.Ed.2d 833 (1989), the City of Yonkers, pursuant to a consent decree entered in the Southern District, initiated condemnation proceedings in state court. Subsequently, the property owners brought actions in state courts to invalidate the proposed condemnations. We affirmed an order directing the City to remove the state court actions. Our principal concern was again the effect of inconsistent judgments with respect to the meaning of a consent decree. A secondary concern was the fear that the City of Yonkers would not vigorously defend the invalidation proceedings. Finally, in In re Baldwin-United Corporation, 770 F.2d 328 (2d Cir.1985), we upheld an injunction prohibiting states from filing civil actions against parties who were defendants in a multi-district securities litigation. We did so in order to effectuate a settlement agreement in which the plaintiffs had waived their state law claims and to ensure that states could not disrupt the agreement by asserting claims derivative of the settled claims. See id. at 336-37.
 
 
 82
 By contrast, the proceeding against Yellow Freight has nothing to do with either the risk of inconsistent decisions concerning the meaning of the Consent Decree, collusive actions by a party to the Decree, or a need to avoid derivative, duplicative actions that would unravel a class action settlement.
 
 IV
 
 83
 I believe that Clement and McGinnis should have been required to file unfair labor practice charges with the NLRB. With the support of the Administrator, they then could have specifically requested the General Counsel to seek preliminary relief under Section 10(j). 29 U.S.C. § 160(j).
 
 
 84
 It may be that my colleagues are influenced by the fact that our court records create what might charitably be called a reasonable doubt as to the capacity of the NLRB to act with anything but, again speaking charitably, glacial speed in adjudicating unfair labor practices. See, e.g., NLRB v. Oakes Machine Corp., 897 F.2d 84 (2d Cir.1990); National Maritime Union of America, AFL-CIO v. NLRB, 867 F.2d 767 (2d Cir.1989). Nevertheless, there is litigation pending in our court indicating that Section 10(j) actions for injunctions are not unknown. NLRB v. Domsey Trading Corp., appeal docketed, No. 91-6203 (2d Cir. Aug. 23, 1991). In any event, the sorry performance of the NLRB is not for us to correct by interpretation of consent decrees between unions and the government.
 
 
 85
 I thus regard my colleagues' decision as a profoundly troubling precedent. The reach of the decision is long but the theories on which it is based seem ill-defined and open-ended. It offers no limits to the power of parties to consent decrees to alter radically the substantive legal rights of non-parties by invoking the "public interest" and the All Writs Act. The best that can be said is that their opinion does so in the congenial factual setting of a corrupt and undemocratic union. I hope that all further references to this decision will be accompanied by the words, "That case is easily distinguishable; it involved the Teamsters."
 
 
 
 [1]
 Hewer has not appealed from this determination, so the balance of the proceedings in this case, including this appeal, are addressed only to the Chicago Ridge controversy
 
 
 [2]
 Throughout these proceedings, the appeal procedures made available by the Consent Decree to the parties thereto have been extended to Yellow Freight. Any failure thus to provide an opportunity to Yellow Freight to litigate its claims would run afoul of Martin, 490 U.S. at 761-62, 109 S.Ct. at 2184-85
 
 
 [3]
 As Judge Winter's dissent suggests, the normally glacial pace of NLRB proceedings regarding unfair labor practice is ill suited to the regulation of ongoing IBT elections envisioned by the Consent Decree. Our jurisdictional ruling, however, is not premised upon this consideration
 
 
 [4]
 Between the time when this opinion was originally issued on October 29, 1991 and its amendment on February 14, 1992, the Supreme Court decided Lechmere, Inc. v. NLRB, 60 U.S.L.W. 4415 (U.S. Jan. 27, 1992), significantly revising the law hereinafter addressed in section C of this Discussion. Because, on remand, this case has been dismissed as moot in view of the completion of the 1991 election of IBT officers, we deem it unnecessary to amend section C of this Discussion, but append this footnote simply to signal the Lechmere development of the law as of the amendment date of this opinion
 
 
 [5]
 We are unpersuaded by the argument of counsel for Clement and McGinnis that Yellow Freight has waived its right to contest the merits on appeal. The Election Officer, the Independent Administrator, and the district court all addressed the merits, and Yellow Freight made clear that it contested those rulings. Yellow Freight placed its primary emphasis in the district court upon other arguments, however, in view of the court's expressed desires concerning the issues to be addressed at the hearing that resulted in the ruling on appeal
 
 
 [6]
 The Election Officer's letter opinion regarding Chicago Ridge observed that Yellow Freight has permitted some solicitation during the Christmas season by United Way in one of the areas alternatively ordered to be made available to Clement and McGinnis, but the issue of discriminatory access was not otherwise pursued
 
 
 [1]
 Amendments to the majority opinion subsequent to receipt of the galleys from West Publishing Co. have stricken references to the consent decree as a source of authority for the majority's decision. In part, therefore, my dissent now appears to be responding to arguments not raised by my colleagues. I am not altering the substance of the dissent for two reasons. First, such an alteration cannot be accomplished before the publishing of this decision in the hardbound volume of the Federal Reporter, Second Series. Second, because I reject the view that the All Writs Act authorized the actions of the district court, it is not inappropriate for me to address the question of whether the consent decree may justify those actions
 I will make one further observation. The basis for the view that the NLRA, as administered by the court officers and district court, governs the issues in the instant matter, is based upon the language of Article Eight, Section 10(d), of the consent decree. If the actions of the district court are actually justified by the All Writs Act, then there is no reason to hold that the NLRA governs the employees' rights to hand out leaflets. The right to engage in such distribution should be determined on the basis of what is necessary to bring about the fair election contemplated by the Decree, whether or not such a right exists under the NLRA.
 
 
 [2]
 I do not mean to suggest that a bright line defines the "pre-existing rights" incorporated by the Consent Decree. Indeed, I can imagine a host of definitional problems arising from the provision. Such problems, however, are not a reason to give the Decree an expansive reading