852

UNITED STATES of America, Plaintiff,

v.

INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, AFL–CIO, The Commission of La Cosa Nostra, Anthony Salerno, a/k/a "Fat Tony," Matthew Ianniello, a/k/a "Matty the Horse," Anthony Provenzano, a/k/a "Tony Pro," Nunzio Provenzano, a/k/a "Nunzi Pro," Anthony Corallo, a/k/a "Tony Ducks," Salvatore Santoro, a/k/a "Tom Mix," Christopher Furnari, Sr., a/k/a "Christie Tick," Frank Manzo, Carmine Persico, a/k/a "Junior," "The Snake," Gennaro Langella, a/k/a "Gerry Lang," Philip Rastelli, a/k/a "Rusty," Nicholas Marangello, a/k/a "Nicky Glasses," Joseph Massino, a/k/a "Joey Messina," Anthony Ficarotta, a/k/a "Figgy," Eugene Boffa, Sr., Francis Sheeran, Milton Rockman, a/k/a "Maishe," John Tronolone, a/k/a "Peanuts," Joseph John Aiuppa, a/k/a "Joey O'Brien," "Joe Doves," "Joey Aiuppa," John Phillip Cerone, a/k/a "Jackie the Lackie," "Jackie Cerone," Joseph Lombardo, a/k/a 'Joey the Clown," Angelo Lapietra, a/k/a "The Nutcracker," Frank Balistrieri, a/k/a "Mr. B," Carl Angelo Deluna, a/k/a "Toughy," Carl Civella, a/k/a "Corky," Anthony Thomas Civella, a/k/a "Tony Ripe," General Executive Board, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Jackie Presser, General President, Weldon Mathis, General Secretary–Treasurer, Joseph Trerotola, a/k/a "Joe T," First Vice President, Robert Holmes, Sr., Second Vice President, William J. McCarthy, Third Vice President, Joseph W. Morgan, Fourth Vice President, Edward M. Lawson, Fifth Vice President, Arnold Weinmeister, Sixth Vice President, John H. Cleveland, Seventh Vice President, Maurice R. Schurr, Eighth Vice President, Donald Peters, Ninth Vice President, Walter J. Shea, Tenth Vice President, Harold Friedman, Eleventh Vice President, Jack D. Cox, Twelfth Vice President,

Don L. West, Thirteenth Vice President, Michael J. Riley, Fourteenth Vice President, Theodore Cozza, Fifteenth Vice President, Daniel Ligurotis, Sixteenth Vice President, Salvatore Provenzano, a/k/a "Sammy Pro," Former Vice President, Defendants.

In re 92–ELECTION APPEAL–253.

No. 88 CIV. 4486 (DNE).

United States District Court,
S.D. New York.

Sept. 24, 1992.

Otto G. Obermaier, U.S. Atty., for S.D.N.Y. (Christine H. Chung, Asst. U.S. Atty., of counsel), for U.S.

Richards Spears Kibbe & Orbe, New York City (David Spears, Linda Imes, and Leanore Barth, of counsel), for Intern. Broth. of Teamsters.

Louis Nikolaidis (Paul Alan Levy, of counsel), Lewis, Greenwald, Kennedy, Lewis, Clifton & Schwartz, P.C., New York City, for Leroy Ellis.

## OPINION & ORDER

EDELSTEIN, District Judge:

This decision arises from the implementation of the rules for the International Brotherhood of Teamsters ("IBT") International Union Delegate and Officer Election (the "Election Rules"), promulgated by the Election Officer and approved as modified by this Court and the Court of Appeals. July 10, 1991 Opinion & Order, 742 F.Supp. 94 (S.D.N.Y.1990), aff'd, 931 F.2d 177 (2d Cir. 1991). Roadway Express, Incorporated ("Roadway") appeals from a decision of the Independent Administrator, 92—Elec.App.—

253, in which he affirmed in part and reversed in part the Election Officer's decision in Election Office Case No. P–916–LU705–CHI. The Independent Administrator affirmed the Election Officer's finding that Roadway discharged its former employee, Leroy Ellis, in retaliation for Mr. Ellis' campaign activities on behalf of a slate of candidates supporting Ronald C. Carey for IBT General President. He reversed the Election Officer's refusal to award Mr. Ellis back pay. For the reasons stated below, the decision of the Independent Administrator is affirmed.

## I. BACKGROUND

The Election Officer, Michael H. Holland, was appointed by this Court pursuant to its March 14, 1989 Order (the "Consent Decree"), which was agreed to by the plaintiff United States of America (the "Government") and the defendant IBT in settlement of this civil racketeering action. The Election Officer was empowered to supervise the implementation of the Consent Decree's electoral provisions, which culminated in the first-ever direct rank and file election of IBT International officers. *See* Consent Decree, § 12.D; October 18, 1989 Opinion & Order, 723 F.Supp. 203, 206–07 (S.D.N.Y.), *appeal dismissed,* No. 89–6252 (2d Cir. Dec. 13, 1989), *cert. denied,* 496 U.S. 925, 110 S.Ct. 2618, 110 L.Ed.2d 639 (1990). In fact, the Election Officer supervised all aspects and stages of this election, including the election of delegates to the IBT Convention from the over 600 IBT Local Unions, the nominations for International Union Office at the IBT Convention, and the approximately 1.5 million member rank-and-file general election of International Union Officers. The Election Officer certified the results of the election on January 22, 1992, which saw Mr. Ronald C. Carey elected IBT General President.

Pursuant to his supervisory authority under the Consent Decree, the Election Officer promulgated the Election Rules, which were approved as modified by this Court and the Court of Appeals. July 10, 1991 Opinion & Order, 742 F.Supp. 94 (S.D.N.Y.1990), *aff'd,* 931 F.2d 177 (2d Cir.1991). The Election Rules were crucial to the successful conduct of the 1991 election, and thus, a central feature of the Consent Decree's efforts to cleanse the IBT of La Cosa Nostra's corrupt influences. October 18, 1989 Opinion & Order, 723 F.Supp. at 206–07; October 25, 1991 Order, slip op. at 1 (S.D.N.Y.1991). The Election Rules protected, *inter alia,* the rights of IBT members to participate in union election campaign activities, *see* Election Rules, Art. VIII, § 10(a), and enabled the Election Officer to respond to violations of the Election Rules, or any other conduct preventing a fair, honest, and open election, with a wide range of remedial measures. *See* Election Rules, Art. XI, § 2. This matter involves the election protest of Leroy Ellis, a member of IBT Local 705 in Chicago, Illinois, who, before his discharge, had been employed as a truck driver at Roadway since 1985. In January 1992, Mr. Ellis was elected an IBT International Vice President on a slate of candidates supporting Mr. Carey for General President. Roadway fired Mr. Ellis on September 19, 1991, allegedly for sleeping on the job the previous day, in the course of making a delivery/pickup at the Burlington Northern ("Burlington") rail yard in Cicero, Illinois.

Mr. Ellis had gone to Burlington to drop off one trailer and pick up and return to Roadway an empty trailer. He had been instructed to take his lunch prior to returning the empty trailer to the Roadway facility. Roadway claims that a Burlington terminal manager, Bob Stein, observed Mr. Ellis' vehicle in an empty lot at approximately 1:45 a.m. and noted that the driver was asleep. Mr. Stein did not attempt to wake Mr. Ellis or request that Mr. Ellis remove his vehicle, even though Burlington had a policy that prohibited truck drivers from taking breaks in the lot where Mr. Ellis allegedly slept. Instead, Mr. Stein's assistant, Bill Beem, conferred with a Roadway Driver Supervisor, Deborah Halstead, who asked Mr. Beem for the time of Mr. Ellis' arrival at the facility, which he reported as 12:32 a.m. Ms. Halstead then determined that Mr. Ellis probably was on his lunch break and would be for another fifteen minutes. Burlington took no further action until Mr. Stein allegedly observed Mr. Ellis still sleeping at 3:15 a.m. and notified Burlington's security offi-

cer, who sounded his horn to wake Mr. Ellis. After the officer supposedly informed Mr. Ellis that he could not sleep in the lot, Mr. Ellis drove away at 3:41 a.m.

Mr. Ellis denies sleeping at any time while on the Burlington facility and also claims that he arrived at 12:51 a.m., not 12:32 a.m. Although Burlington maintains computer records of all driver arrival and departure times, it could not find or produce Mr. Ellis' check-in time. The 12:32 a.m. time is based on a handwritten record. Mr. Ellis asserts that from his arrival at 12:51 a.m. until 2:08 a.m., he unloaded the contents of the trailer he had driven to Burlington. He contends that it took over an hour to unload the trailer because he had to endure a wait before he could begin his task. He avers that he began his lunch break at 2:00 a.m., and that when Burlington's security officer approached him, he was still on his lunch break working on a campaign speech. He left the facility, after his lunch break, at 3:41 a.m.

Roadway fired Mr. Ellis on September 19, 1991, pursuant to a policy, adopted in April 1989, which provides that "gross abuse of company time will be considered an act of dishonesty and will be grounds for immediate dismissal." (Decision of the Election Officer ("Elec.Off.Dec.") at 1, 5). Roadway considers sleeping on the job a "gross abuse of company time." As to Mr. Ellis' disciplinary record prior to this incident, Roadway contends that it had disciplined Mr. Ellis on twenty-three separate occasions prior to his discharge and that it had initiated six additional disciplinary actions against Mr. Ellis. These additional charges were rescinded after hearings before grievance panels. Of these disciplinary charges, five involved misuse of company time, although Local 705's records reflect only three such warnings. These three all occurred prior to the nine months preceding Mr. Ellis' discharge. In this nine-month period, Mr. Ellis received three disciplinary warning notices, two for absenteeism and one for insubordination. Mr. Ellis contends that he has no outstanding disciplinary notices in his record at Roadway because all such notices and actions, including those involving misuse of company time, were resolved in his favor in the grievance procedure.

Mr. Ellis filed an election protest with the Election Officer pursuant to the Election Rules. He claimed that he had not been sleeping on the job and that Roadway had discharged him because of his association with the Carey slate in the upcoming 1991 IBT elections. Mr. Ellis also filed charges with both the National Labor Relations Board (the "NLRB") and a grievance panel, established pursuant to a collective bargaining agreement between Roadway and the IBT, based on the same grounds presented to the Election Officer. On November 1, 1991, the grievance panel concluded that Roadway had fired Mr. Ellis for sleeping on the job. On February 7, 1992, the NLRB found that "the evidence does not show that [Mr. Ellis was] discharged because of ... union activities, but rather for the reasons advanced by the Employer at the time of ... discharge[ ]." Letter from Elizabeth Kinney, Regional Director of the National Labor Relations Board, to Leroy Ellis, IBT Vice President (February 7, 1992) (on file with the Southern District of New York).

On June 14, 1991, the Election Officer issued his decision in this matter. He found that Roadway had discharged Mr. Ellis because of his candidacy for International Union office as a member of the Ron Carey slate. He reasoned that Mr. Mike Lamphere, the terminal manager at the Chicago Heights facility where Mr. Ellis worked, wanted to discharge him. A former Roadway supervisor, Mr. Wayne Johnson, informed the Election Officer that at a weekly meeting of supervisors in March 1991, Mr. Lamphere publicly stated Roadway's opposition to the Carey slate: "We're not for the Carey Slate, that's for sure." (Elec.Off.Dec. at 6). Mr. Lamphere also directed those who attended this meeting to keep a special eye on Mr. Ellis and two other individuals who had campaigned actively on behalf of the Carey slate, adding that he wished to bring disciplinary charges against them. Mr. Lamphere reiterated these remarks at a meeting of supervisors held in June 1991. Although Roadway denied that Mr. Lamphere made these remarks, the Election Offi-

cer credited Mr. Johnson's testimony because Mr. Johnson had no motive to lie, is no longer a Roadway employee due to his retirement in October 1991, and can expect no benefit from the current IBT administration because he has terminal brain cancer. *See id.* at 7. The Election Officer also proffered the possibility of a collusive relationship between Roadway and Burlington: Mr. Lamphere had worked for Burlington, and the Election Officer suggested that Burlington breached its policy prohibiting truck drivers from taking breaks on the premises to collect incriminating evidence on Mr. Ellis. Breaching the policy would have been necessary to collect such evidence because Burlington allegedly discovered Mr. Ellis sleeping while on break, which is not misuse of company time. Furthermore, the Election Officer noted that "Mr. Ellis was the first and only employee to be discharged by Roadway for misuse of company time who did not have prior discipline for that offence [sic] within nine (9) months of the date of discharge." (Elec.Off.Dec. at 8). Based on these findings, the Election Officer concluded that Mr. Ellis' discharge was in retaliation for his campaign activities, and thus, in violation of Article VIII, Section 10(a) of the Election Rules.[1] Because even absent the discharge Mr. Ellis would have resigned his position at Roadway to assume his position in the IBT administration, the Election Officer ordered Roadway to rescind its discharge action and provide him an "honorable resignation." The Election Officer refused, however, to award Mr. Ellis back pay because following his discharge he chose not to mitigate damages, but rather opted to campaign on a full-time basis for International Union office.

Roadway appealed the Election Officer's decision to the Independent Administrator, who held a hearing by telephone conference on June 29, 1992. The Independent Administrator affirmed the Election Officer's finding of retaliatory discharge, but reversed the Election Officer's refusal to award Mr. Ellis back pay. The Independent Administrator based his finding of retaliatory discharge, in part, on the testimony of Mr. Johnson, which the Independent Administrator found credi-

ble, and in part on the severity of the penalty imposed upon Mr. Ellis in light of penalties imposed upon other Roadway employees. The Independent Administrator found that "Mr. Ellis was set-up so that a serious disciplinary proceeding could be initiated against him." (Decision of the Independent Administrator ("Ind.Admin.Dec.") at 8). The Independent Administrator reversed the Election Officer's back pay decision after finding that Mr. Ellis had attempted to mitigate damages suffered due to the discharge by seeking other employment until January 1992, when Mr. Ellis learned he had been elected to International Union office. The Independent Administrator found that the Election Officer's decision concerning Mr. Ellis' efforts to obtain employment stemmed from an erroneous assumption: The parties had not submitted evidence on Mr. Ellis' attempts to mitigate damages, nor had the Election Officer requested such evidence, due to his assumption that given Mr. Ellis' heavy campaign schedule, he did not look for work.

### Discussion

Roadway challenges the Independent Administrator's decision on the grounds that: (1) the Election Officer and the Independent Administrator had no authority to render decisions in this case because their authority under the Consent Decree had lapsed; (2) this Court has no authority to enforce orders issued under the Consent Decree against Roadway, which is not a party to the Consent Decree; (3) the Independent Administrator's decision is arbitrary and capricious. Roadway's arguments are without merit.

### A. The Election Officer and the Independent Administrator Had Authority to Resolve this Matter

■ Roadway asserts that the Election Officer and the Independent Administrator lacked authority under the Consent Decree to decide Mr. Ellis' election protest. An analysis of two provisions of the Consent Decree reveals that this argument is patently flawed. Section B.3 of the Consent Decree

---

**1.** Article VIII, Section 10(a) of the Election Rules provides in relevant part that "[a]ll Union members retain the right to participate in campaign activities."

provides that the authority of the Court–Appointed Officers terminated upon "the certification of the 1991 election results." The phrase "certification of the 1991 election results" is a term of art in the Consent Decree, referring to the earlier of the actual certification of the election results or one month following the final balloting. The Election Officer certified the election results on January 22, 1992 and the final balloting occurred on December 10, 1991. Accordingly, "certification of the 1991 election results" occurred on January 10, 1992. Nevertheless, Section B.3(1) of the Consent Decree provides an exception to the general rule that the Election Officer's authority terminates on January 10, 1992 by allowing the Election Officer and the Independent Administrator to "resolve all disputes concerning the conduct and/or results of the elections conducted in 1991." Thus, the Election officer had authority to consider Mr. Ellis' protest if it involved the conduct of the 1991 elections. Mr. Ellis' protest involves a claim that Roadway discharged him as a result of his campaign activities on behalf of the Carey slate, and therefore, it implicates the conduct of the 1991 election for International Union office.

### B. This Court Has Authority to Issue Orders Enforceable Against Roadway

■ Because it is not a party to the Consent Decree, Roadway claims that it is not bound by this Court's orders that derive from its administration of the Consent Decree. This Court has rejected identical arguments on several occasions. *See* October 29, 1991 Opinion & Order, 776 F.Supp. 144, 150 (S.D.N.Y.1991), *aff'd*, 954 F.2d 801 (2d Cir. 1992) ("Star Market"), *cert. denied*, — U.S. —, 112 S.Ct. 2993, 120 L.Ed.2d 870 (1992); October 25, 1991 Order, *slip op.* at 6 (S.D.N.Y.1991); April 3, 1991 Opinion & Order, 1991 WL 51065 (S.D.N.Y.), *vacated on other grounds*, 948 F.2d 98 (2d Cir.1991) ("Yellow Freight"), *petition for cert. filed*, 60 U.S.L.W. 3843 (U.S. May 29, 1992). As in *Yellow Freight* and *Star Market*, this Court does not seek to bind Roadway to the Consent Decree. Instead, at issue here is the Court's authority to issue an order that affects Roadway and is necessary to implement the Consent Decree. This Court's power to issue such orders is well settled. This Court derives its authority to enforce orders concerning the Consent Decree against non-parties from the All Writs Act, 28 U.S.C. § 1651, which provides that the "Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." Acknowledging that entities, although not parties to the Consent Decree, may nevertheless be in a position to frustrate the effective implementation of the parties' agreement, the Second Circuit has held that "[i]njunctions may be issued against non-parties under the All Writs Act." *United States v. IBT*, 907 F.2d 277, 281 (2d Cir. 1990); *see Yellow Freight*, 948 F.2d at 102–103 (court has power to issue, against a nonparty, an order "under the All Writs Act to effectuate the [Consent] Decree"). Indeed, as this Court previously has stated:

> under the All Writs Act, the Election Rules extend to entities that could jeopardize the IBT membership's right to a free, fair and honest election. Specifically, this Court ruled that Yellow Freight, a company employing IBT members but not itself affiliated with the IBT, was subject to the election rules because it was "in a position to frustrate the implementation of the Consent Decree and the election rules."

October 29, 1991 Opinion & Order, 776 F.Supp. at 150 (quoting May 13, 1991 Memorandum & Order, 764 F.Supp. 817, 821 (S.D.N.Y.), *vacated on other grounds*, 964 F.2d 180 (2d Cir.1992)).

■ Bowing to this settled principle, Roadway apparently concedes this Court's general authority to enforce orders concerning the Consent Decree against non-parties pursuant to the All Writs Act. It avers, however, that the circumstances of this particular case render an exercise of All Writs Act jurisdiction inappropriate. It notes that this Court may issue orders under the All Writs Act only if the orders are " 'necessary and appropriate' to the implementation of the Consent Decree, and ... agreeabl[e] 'to the usages and principles of law.' " *Yellow Freight*, 948 F.2d at 103 (quoting 28 U.S.C.

§ 1651). Roadway asserts that an order issued against Roadway in this matter would: (1) not be "necessary or appropriate" to implementation of the Consent Decree because the 1991 elections are completed, and this matter does not involve allegations of La Cosa Nostra influence; (2) not be "agreeable to the usages and principles of law" because the NLRB already resolved this matter; and (3) impose an unreasonable burden on Roadway because it would alter its collective bargaining agreement with the IBT.

The Independent Administrator's order, which compels Roadway to place an "honorable discharge" notice in Mr. Ellis' file and to provide him back pay, is "necessary and appropriate" to implementation of the Consent Decree. The opening paragraphs of the Consent Decree recognize the influence of organized crime in the IBT, and emphatically state that this repugnant influence should be eradicated. Consent Decree, at p. 2 (fourth & fifth Whereas clauses). In addition, the parties agreed that it was "imperative" to maintain the Union "democratically and with integrity for the sole benefit of the membership." *Id.* (sixth Whereas clause).

The 1991 election of International Union officers, while a crucial component of the Consent Decree's remedial provisions, represents a means to achieve the larger goal of "*maintain[ing]* the Union democratically, with integrity, and for the sole benefit of its members." Consent Decree, at p. 2 (sixth Whereas clause) (emphasis added). Discharging Mr. Ellis for his campaign activities is antithetical to the notion of maintaining the Union democratically, which implies that the general membership can "actively participate in and freely discuss all aspects of union affairs without fear of psychological, physical or economic retaliation." August 19, 1992 Opinion & Order, 803 F.Supp. 761, 785 (S.D.N.Y.1992). Moreover, the goal of maintaining Union democracy has not been realized despite the successful completion of the 1991 election. Such a goal "does not occur over night, but rather occurs only with perpetual vigilance." *Id.* at p. 781. Failure to redress Roadway's misconduct by correcting Mr. Ellis' file and awarding him back pay is the equivalent of sanctioning such behavior.

This results in sending a message to the general membership that in future elections, whether on the local or international level, active and vigorous campaign activity may result in various forms of retribution, including loss of livelihood. *See also Yellow Freight,* 948 F.2d at 103 ("We believe that there is a strong public interest in the ongoing effort in this litigation to open the IBT to democratic processes.").

■ Roadway also argues that the Independent Administrator's order is not "agreeable to the usages and principles of law." It reasons that because a grievance panel, established pursuant to a collective bargaining agreement between Roadway and the IBT, and the NLRB, both concluded that Roadway had dismissed Mr. Ellis for sleeping on the job, the Independent Administrator's decision is contrary to federal labor law principles. Such an argument is wholly without merit. In *Star Market,* another case involving an employer of Teamsters that had no other affiliation with the IBT, the Second Circuit addressed the effect of an arbitrator's determination under a collective bargaining agreement on the rulings of the Court–Appointed Officers. The court held that the Election Officer and the Independent Administrator were not bound by the arbitrator's legal or factual determinations in connection with adjudication under a collective bargaining agreement. *See Star Market,* 954 F.2d at 809. The court's holding was "grounded on the principle that a federal court need not defer to an arbitrator's decision when a plaintiff's labor-related claim stems from a source of legal rights that is separate from, although possibly coextensive with, a collective bargaining agreement." *Id.* at 808–09. The court added that "we think it consistent with federal labor policy that where they differ, [decisions under] collective bargaining agreements yield to the Consent Decree, and that the Consent Decree officers and the district court remain free to complete their task unencumbered by collateral arbitration agreements." *Id.* at 810. Similarly, in *Yellow Freight,* the Second Circuit held that this Court and the Court–Appointed Officers could adjudicate issues under the Consent Decree even if the issues "might arguably be deemed an unfair labor practice under the"

National Labor Relations Act ("NLRA"). *Yellow Freight*, 948 F.2d at 106. The court reasoned that such a ruling avoided inconsistent interpretations of the Consent Decree, reduced repetitive litigation and facilitated efficient administration of the Consent Decree. *See id.*

■ As in *Yellow Freight* and *Star Market*, Mr. Ellis' claim before the grievance panel and the NLRB stemmed from sources of rights, a collective bargaining agreement and Section 8 of the NLRA, that are separate and distinct from the source of rights that gave rise to his claim before the Election Officer and the Independent Administrator. *See* Letter from Elizabeth Kinney, Regional Director of the National Labor Relations Board, to Leroy Ellis, IBT Vice President (February 7, 1992) (on file with the Southern District of New York). The Court–Appointed Officers, therefore, are not bound by the grievance panel's or the NLRB's determination. It is true that, in contrast to the situation in *Star Market*, identical issues were before the grievance panel and the NLRB on the one hand, and the Court–Appointed Officers on the other—both sets of entities adjudicated whether Mr. Ellis had been fired for sleeping on the job. Nevertheless, the rationale animating the decision in *Star Market* applies with equal force in this situation: where the Court–Appointed Officers and another adjudicative body reach contrary conclusions, and the claims before each stem from different sources of rights, the Court–Appointed Officers' decisions under the Consent Decree will take precedence due to the complexity of administering the parties' agreement.

■ Finally, Roadway argues that an award of back pay is improper under the All Writs Act. Although Roadway's memorandum of law is devoid of a meaningful articulation of this argument, it seems to reason that such an award represents a retrospective obligation that is not permissible under equitable principles. In *United States v. IBT*, 964 F.2d 180, 182 (2d Cir.1992) ("Western Conference"), the Election Officer ordered a trustee to reimburse the trust for costs and expenses associated with a study of two pension plans that he commissioned and that constituted political campaigning prohibited

by the Election Rules. The Second Circuit held that the All Writs Act did not authorize an order compelling such relief. The court reasoned that "imposition of a monetary obligation is normally the office of a judgment, not that of an ancillary writ," and thus, orders issued pursuant to the All Writs Act cannot "impose a retrospective monetary obligation upon a party." *Id.* at 184–85.

■ An award of back pay, however, is not equivalent to the relief ordered in *Western Conference*. The Supreme Court has held that "[t]he fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages.' " *Bowen v. Massachusetts*, 487 U.S. 879, 893, 108 S.Ct. 2722, 2732, 101 L.Ed.2d 749 (1988). In fact, "damages" are considered equitable relief where they are restitutionary in nature. *See International Bhd. of Teamsters, Local No. 391 v. Terry*, 494 U.S. 558, 570, 110 S.Ct. 1339, 1347, 108 L.Ed.2d 519 (1990); *Mitchell v. DeMario Jewelry*, 361 U.S. 288, 293, 80 S.Ct. 332, 336, 4 L.Ed.2d 323 (1959). Indeed, in *Western Conference* the Second Circuit acknowledged that restitution is an appropriate remedy under the All Writs Act. *See Western Conference*, 964 F.2d at 185. In this case, an award of back pay is analogous to restitution in that it represents an attempt to make a "worker[ ] whole for losses suffered on account of unfair labor practices." *Albemarle v. Moody*, 422 U.S. 405, 419, 95 S.Ct. 2362, 2372, 45 L.Ed.2d 280 (1975). Indeed, the Second Circuit also has recognized this principle in an identical factual scenario in another matter in this litigation: In *Star Market*, the court upheld an award of back pay under the All Writs Act against an employer of Teamsters, which was not a party to the Consent Decree, because it had fired the employee due to the employee's campaign activities. *See Star Market*, 954 F.2d at 806.

*C. The Independent Administrator's Decision Is Supported by Substantial Evidence and Is Neither Arbitrary nor Capricious*

*1. The Independent Administrator's Decision*

■ Roadway contends that the Independent Administrator's decision is arbitrary

and capricious. It reasons that Mr. Ellis failed to establish a prima facie case and that Roadway consistently fires employees who sleep on the job. In reviewing decisions of the Independent Administrator, it is well settled that the findings of the Independent Administrator "are entitled to great deference." *United States v. IBT*, 905 F.2d 610, 616 (2d Cir.1990), *aff'g* March 13, 1990 Opinion & Order, 743 F.Supp. 155 (S.D.N.Y.1990); *see United States v. IBT*, 970 F.2d 1132, 1137 (2d Cir.1992). This Court will overturn the findings of the Independent Administrator when it determines that they are, on the basis of all the evidence, "arbitrary or capricious." *United States v. IBT*, 964 F.2d 1308, 1311 (2d Cir.1992); August 27, 1990 Opinion & Order, 745 F.Supp. 908, 911 (S.D.N.Y. 1990), *aff'd*, 941 F.2d 1292 (2d Cir.), *cert. denied*, — U.S. —, 112 S.Ct. 76, 116 L.Ed.2d 50 (1991); March 13, 1990 Opinion & Order, 743 F.Supp. 155, 165 (S.D.N.Y.1990), *aff'd*, 905 F.2d 610 (2d Cir.1990); *see* July 14, 1992 Opinion & Order, 803 F.Supp. 748, 753–55 (S.D.N.Y.1992); July 13, 1992 Opinion & Order, 803 F.Supp. 740, 745–46 (S.D.N.Y. 1992); July 9, 1992 ·Opinion & Order, 803 F.Supp. 734, 737–38 (S.D.N.Y.1992); May 15, 1992 Opinion & Order, 792 F.Supp. 1346, 1351–52 (S.D.N.Y.1992); April 27, 1992 Memorandum & Order, 791 F.Supp. 421, 425 (S.D.N.Y.1992); February 11, 1992 Memorandum & Order, 787 F.Supp. 345, 350 (S.D.N.Y.1992); January 20, 1992 Memorandum & Order, 782 F.Supp. 256, 259 (S.D.N.Y. 1992); January 16, 1992 Memorandum & Order, 782 F.Supp. 238, 241 (S.D.N.Y.1992), *aff'd*, 978 F.2d 706 (2d Cir.1992); November 8, 1991 Memorandum & Order, *slip opinion*, at 4–5, 1991 WL 243268 (S.D.N.Y.1991); October 29, 1991 Opinion & Order, 776 F.Supp. 144, 152–53 (S.D.N.Y.1991), *aff'd*, 954 F.2d 801 (2d Cir.1992), *cert. denied*, — U.S. —, 112 S.Ct. 2993, 120 L.Ed.2d 870 (1992); October 25, 1991, Order, *slip opinion*, at 4–5 (S.D.N.Y.1991); October 24, 1991 Memorandum & Order, 777 F.Supp. 1133, 1136 (S.D.N.Y.1991), *aff'd*, 970 F.2d 1132, 1137 (2d Cir.1992); October 16, 1991 Memorandum & Order, 777 F.Supp. 1130, 1132 (S.D.N.Y. 1991), *aff'd*, 964 F.2d 1308 (2d Cir.1992); October 11, 1991 Memorandum & Order, 777 F.Supp. 1127, 1128 (S.D.N.Y.1991), *aff'd*, 956 F.2d 1161 (2d Cir.1992); October 9, 1991 Memorandum & Order, 777 F.Supp. 1123, 1125 (S.D.N.Y.1991), *aff'd*, 978 F.2d 706 (2d Cir.1992); August 14, 1991 Memorandum & Order, *slip opinion*, at 4, 1991 WL 161084 (S.D.N.Y.1991); July 31, 1991 Memorandum & Order, *slip opinion*, at 3–4, 1991 WL 150226 (S.D.N.Y.1991), *aff'd*, 956 F.2d 1161 (2d Cir.1992); July 18, 1991 Memorandum & Order, *slip opinion* at 3–4, 1991 WL 136030 (S.D.N.Y.1991), *aff'd*, 956 F.2d 1161 (2d Cir. 1992); July 16, 1991 Opinion & Order, *slip opinion*, at 3–4, 1991 WL 136029 (S.D.N.Y. 1991); June 6, 1991 Opinion & Order, 775 F.Supp. 90, 93 (S.D.N.Y.1991), *aff'd in relevant part*, 948 F.2d 1278 (2d Cir.1991); May 13, 1991 Memorandum & Order, 764 F.Supp. 817, 820–21 (S.D.N.Y.1991), *vacated on other grounds*, 964 F.2d 180 (2d Cir.1992); May 9, 1991 Memorandum & Order, 764 F.Supp. 797, 800 (S.D.N.Y.1991) *aff'd*, 956 F.2d 1161 (2d Cir.1992); May 6, 1991 Opinion & Order, 764 F.Supp. 787, 789 (S.D.N.Y.), *aff'd*, 940 F.2d 648 (2d Cir.), *cert. denied*, — U.S. —, 112 S.Ct. 76, 116 L.Ed.2d 50 (1991); December 27, 1990 Opinion & Order, 754 F.Supp. 333, 337 (S.D.N.Y.1990); September 18, 1990 Opinion & Order, 745 F.Supp. 189, 191–92 (S.D.N.Y.1990); January 17, 1990 Opinion & Order, 728 F.Supp. 1032, 1045–57, *aff'd*, 907 F.2d 277 (2d Cir.1990).

## 2. The Independent Administrator Correctly Applied Wright Line to Roadway's Conduct

■■■ The Independent Administrator found that in cases where it is alleged that a discharge was motivated, at least in part, by an employee's protected campaign activity, the NLRB's decision in *Wright Line*, 251 N.L.R.B. 1083, *aff'd*, 662 F.2d 899 (1st Cir. 1981), *cert. denied*, 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982), controls resolution of the matter. Indeed, in *NLRB v. Transportation Management Corp.*, 462 U.S. 393, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983), the Supreme Court approved use of the *Wright Line* analysis in such cases. Under *Wright Line*, Mr. Ellis has the burden of proving that his "protected conduct was a substantial or motivating factor in the adverse action." *Id.* at 401, 103 S.Ct. at 2474.

Upon making this showing, however, the employer may still "avoid being adjudicated a violator by showing what his actions would have been regardless of his forbidden motivation." *Id.*

Applying *Wright Line* to this matter, the Independent Administrator concluded that "Mr. Ellis ha[d] made a *prima facie* showing that his political activity was a 'motivating factor' in his discharge," and that Roadway had failed to show that it would have discharged Mr. Ellis regardless of his campaign activity. (Ind.Admin.Dec. at 7). As to the "motivating factor" prong of the *Wright Line* test, the Independent Administrator adopted the Election Officer's decision to credit the testimony of Mr. Johnson. The Independent Administrator thus gave weight to Mr. Lamphere's stated distaste for the Carey slate and his desire to generate disciplinary action against Mr. Ellis if possible. The Independent Administrator reasoned that "[n]ot only is the Election Officer a neutral factfinder, but Mr. Johnson's information regarding Mr. Lamphere's instructions to the Roadway staff to initiate disciplinary proceedings against Mr. Ellis is consistent with the facts of this case.... I find that Mr. Ellis was set-up so that a serious disciplinary proceeding could be initiated against him." *Id.* at 8.

The Independent Administrator also rejected Roadway's contention that it would have fired Mr. Ellis regardless of his campaign activity. He reasoned that under its "gross-abuse-of-company-time" policy, Roadway gave termination notices to nine employees who never before had been suspended for such gross abuse. "Of these nine, eight were subsequently voluntarily reinstated by Roadway. The single employee who was not voluntarily reinstated had been issued four prior disciplinary notices for abuse of company time within the nine months preceding his termination. Even this ninth individual, however, was reinstated following a grievance hearing." *Id.* at 10. In addition, the Independent Administrator rejected Road-

way's contention that the abuse is aggravated in this case because it occurred on a customer's property. He reasoned that "Burlington permitted Mr. Ellis to continue sleeping for over an hour-and-a-half after first discovering him. Thus, apparently, Burlington does not take its own policy prohibiting truck drivers from taking breaks on its property all too seriously." *Id.* Finally, the Independent Administrator noted that although Mr. Ellis had accrued 29 disciplinary offenses in eight years, only five of these involved abuse of company time, and these five were rescinded following grievance proceedings. "Thus, despite Roadway's 'gross abuse' policy, as of the date of his discharge Mr. Ellis was the only Roadway employee, without any prior notice on file, not to be reinstated after being discharged for abusing company time." *Id.* at 10–11. Accordingly, the Independent Administrator affirmed the Election Officer's finding that Mr. Ellis' campaign activity motivated Roadway's termination decision.

### 3. Roadway's Basis for Arguing that the Independent Administrator's Decision Is Arbitrary and Capricious

#### a. Mr. Johnson's Credibility

Roadway contends that the Independent Administrator's decision is not supported by substantial evidence because Mr. Ellis did not establish a prima facie case and because the evidence reveals that Roadway would have fired Mr. Ellis regardless of his campaign activities. As to establishing a prima facie case, Roadway asserts that both the Independent Administrator and the Election Officer relied on incorrect information when they credited Mr. Johnson's testimony.[2] (Roadway Express, Inc.'s Appeal of the Independent Administrator's Decision ("Roadway Appeal"), at 19–22).

▮▮▮ Roadway asserts that the Independent Administrator failed to consider that Mr. Johnson: (1) repeatedly had taken time off for medical reasons without providing

---

**2.** According to Roadway, the Independent Administrator: (1) refused, prior to the hearing, to inform Roadway's counsel of the standard of review; (2) refused at the hearing to allow Roadway to submit evidence—not submitted to the Election Officer—concerning Mr. Johnson's

credibility, even though it allowed Mr. Ellis to submit "new" evidence on the issue of back pay; and (3) prohibited Roadway from submitting post-hearing submissions concerning Mr. Johnson's credibility.

documentation; (2) filed a claim against Roadway alleging race discrimination; (3) did not retire on disability in October 1991, but rather was discharged in April 1992 for excessive absenteeism; and (4) did not have terminal brain cancer. Roadway asserts that by failing to consider such information in crediting Mr. Johnson's testimony, the Independent Administrator ignored Mr. Johnson's motivation to lie, and thus, rendered an arbitrary and capricious decision.

By making such an argument, Roadway asks this Court to substitute its assessment of the credibility of evidence offered on Mr. Ellis' behalf for that of the Election Officer and the Independent Administrator, who investigated the matter and conducted the hearing and thus were in the best position to judge credibility. *See* January 20, 1992 Memorandum & Order, 782 F.Supp. 256, 259 (S.D.N.Y.1992); October 16, 1991 Memorandum & Order, 777 F.Supp. 1130, 1133 (S.D.N.Y.1991), *aff'd,* 964 F.2d 1308 (2d Cir. 1992)); *see also United States v. IBT,* 964 F.2d 1308, 1313 (2d Cir.1992) ("We find no reason to question [the Court–Appointed Officers'] credibility determination[s], especially given [their] superior vantage point."). In this case, the Election Officer or his staff spoke with Mr. Johnson during the course of the Election Officer's investigation into Mr. Ellis' protest. After receiving Mr. Johnson's statements and concluding that Mr. Johnson had no motivation to lie, the Election Officer credited his testimony. After a telephone hearing in this matter, at which Roadway had an opportunity to challenge the Election Officer's credibility determination, the Independent Administrator affirmed the Election Officer's assessment of Mr. Johnson's testimony. The Independent Administrator found Mr. Johnson's statements credible in light of both the facts of this case and the concurring judgment of the Election Officer, whose staff took Mr. Johnson's testimony. This Court will not supplant its credibility determination for that of the two Court–Appointed Officers. Their decision to credit the disputed testimony is amply supported by the evidence and is in no way arbitrary or capricious.

Even were this Court to accept Roadway's assertions concerning Mr. Johnson's credibility, it would not find the Independent Administrator's decision arbitrary and capricious. The Independent Administrator credited Mr. Johnson's testimony in part out of deference to the judgment of the Election Officer, who took Mr. Johnson's testimony, and in part because it is supported by the facts of the case. This Court finds that even if Mr. Johnson had a motive to lie, his testimony is nonetheless credible because it is independently corroborated by other relevant facts. These facts include the possibility of a "cozy" relationship between Roadway and Burlington; Roadway's illogical decision not to have Burlington wake Mr. Ellis immediately upon learning that he was asleep on Burlington property, even though this constituted a breach of Roadway and Burlington policy; Roadway's unique application of its gross abuse policy in this case, in which it failed to reinstate Mr. Ellis when Roadway had reinstated similarly situated employees; and Roadway's inability to produce a computerized record of Mr. Ellis' arrival time at Burlington on the night in question. These facts suggest that Roadway's action was politically motivated. Mr. Johnson's testimony also suggests retaliatory discharge. Based upon such corroboration, the Independent Administrator had a reasonable basis to credit Mr. Johnson's testimony. Moreover, the Independent Administrator considered, and rejected, Roadway's evidence concerning Mr. Johnson's credibility: "Roadway clearly articulated its position at the hearing and a post-hearing submission would not have added anything but delay to the process." *Id.* at 1312 n. 2. Therefore, the Independent Administrator's decision to credit Mr. Johnson's testimony was not arbitrary or capricious. Moreover, as previously noted, the other evidence in this case amply supports the Independent Administrator's decision, and thus, even ignoring Mr. Johnson's testimony, this Court finds that his decision is not arbitrary or capricious.

### b. Other Evidence of Retaliatory Discharge

▪ Roadway next asserts that the Independent Administrator erred when, in finding a "set-up," he relied on Burlington's fail-

ure to wake Mr. Ellis immediately upon discovering him sleeping. Roadway proffers that Mr. Ellis alone was responsible for remaining awake while on duty, and thus, Roadway should not bear any blame for failing to wake him or have Burlington wake him. Roadway's argument is not persuasive. Roadway could have had Burlington wake Mr. Ellis. Instead, it elected to have Burlington remain idle. This allegedly resulted in Mr. Ellis' continuing to sleep for several more hours, in breach of both Roadway and Burlington policy. Such a breach, if it occurred, would have been avoided had Roadway made the seemingly logical decision to wake Mr. Ellis because sleeping while on lunch is not a gross abuse of company time. It does not require a quantum leap of either imagination or intelligence to conclude that by opting not to wake him, and thus allowing Mr. Ellis to continue in a violation of both Roadway and Burlington policy, Roadway fulfilled Mr. Lamphere's desire to generate charges against Mr. Ellis.

### c. Roadway's Affirmative Defense

■ As to Roadway's assertion that it would have discharged Mr. Ellis regardless of his campaign activity, Roadway contends that it consistently fires employees who, without justification, sleep on the job. In addition to this supposed policy, Roadway avers that it refused to reinstate Mr. Ellis because at the time of the discharge, he had worked at Roadway for only eight years and, "despite overwhelming evidence that Ellis was asleep, Ellis continued to claim that he had not slept and showed no remorse." (Roadway's Appeal, at 26).

The Independent Administrator relied on several pieces of evidence in refusing to find that Roadway would have dismissed Mr. Ellis regardless of his campaign activity. The Independent Administrator considered that Roadway has fired nine other employees for violating the gross abuse policy, but that the eight who, like Mr. Ellis, had received no disciplinary notices for abuse of company time in the preceding nine months, were voluntarily reinstated. While Roadway contends that decisions concerning whether to reinstate an employee are made on an indi-

vidual basis, it cannot use such an assertion with talismanic effect to avoid the implications of its reinstatement history. The Independent Administrator also refused to credit Roadway's assertion that Mr. Ellis' offense was aggravated because it occurred on Burlington's property, given that Burlington chose not to enforce its "no-sleeping" policy when it allowed Mr. Ellis to continue sleeping. In light of these considerations and the circumstances of this case, the Independent Administrator found that Roadway's decision was politically motivated. Such a finding is amply supported by the evidence.

### Conclusion

Accordingly, the Independent Administrator's decision is supported by substantial evidence, and is neither arbitrary nor capricious.

IT IS HEREBY ORDERED that Roadway's objections to the Independent Administrator's decision are without merit; and

IT IS FURTHER ORDERED that the Independent Administrator's decision is affirmed in its entirety.

SO ORDERED.